# NELLIE N. NEWTON, Respondent, v. AUGUST REBE-NACK, Appellant.

### St. Louis Court of Appeals, December 17, 1901.

1. **Trustee.** The trustee in this case was guilty of breaches of the trust.

2. **Trustee of Express Trust: STATUTE OF USES, WHEN EXE-CUTED.** Where the trustee of an express trust is charged with the performance of active duties by the instrument appointing him, the statute of uses does not execute the trust and vest the absolute ownership and title of the property in the beneficiary.

3. ————: TERMINATION OF TRUST, WHEN. Such a trust can never be terminated except by full performance or the consent of all parties interested; and if some of the remaindermen provided for are not yet in being, the trust can neither be revoked nor terminated at all, but must be performed.

4. **Trustee, when he may encroach on corpus of Trust.** The rule that a trustee may sometimes encroach on the corpus of the trust estate to relieve the beneficiary, should never be applied except where the necessities of the beneficiary were extreme; and never when remaindermen are named after the death of the life tenant.

5. ————: ACTION BY CESTUI QUE TRUST: BREACH OF TRUST: EXPRESS TRUST. An action by a *cestui que trust* against a trustee for breaches of the provisions of an express trust created by a written instrument, is barred in ten years, and falls within that clause of the statute of limitations which bars, after ten years, actions for relief not therein otherwise provided for.

6. ————: ————: A CESTUI QUE TRUST, WHO IS SUI JURIS, WHEN PRECLUDED FROM BRINGING ACTION AGAINST TRUSTEE. A *cestui que trust* who is *sui juris* will be precluded from maintaining an action against the trustee for breaches which he or she induced the trustee to commit or concurred in, on the ground that such concurring *cestui que trust* waived the performance of the trust according to its terms.

7. ———: ———. Where a *cestui que trust* is induced by the solicitation of a trustee to consent to a diversion of the trust estate, which was personalty, into real estate taken in the name of the trustee, and afterwards sues for a rescission of the matter and the restoration of the fund, the burden is on the trustee to show he acted in perfect good faith, that the *cestui que trust* was fully apprised of his or her rights and knew the diversion was a breach of the trust, and that she could resist it by an appeal to the courts. The trustee must also show the diversion of the fund was for the interest of the beneficiary; and as much must be shown to establish a ratification of the diversion by the beneficiary.

8. **Court of Equity**: JURISDICTION. When a court of equity properly acquires jurisdiction of a cause of an equitable nature, it will do complete justice in the matter.

9. **Services of Trustee, when no compensation allowed for.** A trustee who breaks the trust should be denied compensation for his services.

10. **A Beneficiary Who Profits by Breach of Trust Should Contribute to Other Beneficiaries for Diminution of Trust Estate.** A beneficiary who induces or profits by a breach resulting in a diminution of the estate, should be made to contribute out of his or her interest in the estate to make good the principal in favor of other beneficiaries.

Appeal from St. Louis City Circuit Court.—*Hon. John A. Talty,* Judge.

AFFIRMED *(with instructions).*

## STATEMENT OF THE CASE.

On March 29, 1878, Charles H. Neibelung conveyed to John C. Salzgeber sixty paid-up shares of stock of the Pawn & Loan Bank of St. Louis, in trust for certain purposes as follows:

"The said trustee shall take the said property into his immediate possession, and manage and control the same, and is hereby invested with full power and authority whenever

he may deem it advantageous to said trust to sell the same and convey to such person or persons and on such terms of payment as he may deem fit; and the produce of any sale or sales he shall invest, and, at pleasure, reinvest in good, sound, income-bearing securities, whether bonds, stocks or notes, secured by deed of trust or mortgage on unincumbered real estate of at least double value.

"All income arising from the above trust, after deducting therefrom taxes of all kinds, expenses of management, and disposal, if any, and a reasonable commission to said trustee for his trouble and services in and about the execution of his trust—provided said trustee shall see fit to charge any, and does make such charge immediately whenever he has had such trouble or done such services, otherwise forfeiting any claim thereto, shall be by him disposed of as follows: He shall pay all expenses for board, clothing, tuition and education of Miss Nellie N. Newton, so that she may get a good collegiate education and learn all she wants to learn, and he shall pay all other expenses of said Nellie N. Newton, the balance, if any, after paying all of said items, he shall add to the original fund until said Nellie N. Newton has reached her sixteenth year, that is to say, up to the third day of February, 1887, then he shall pay the annual balance of all proceeds annually over to her for her own free use. The trustee shall give account of his disposal and investment of said trust annually to said Miss N. N. Newton, or to any person who may be appointed her guardian. If said Nellie N. Newton should die without leaving any descendants, then said trust shall cease and shall become the absolute property of said Charles H. Neibelung or his lawful heirs, and if said Nellie N. Newton should leave any (heirs) descendants it shall become the absolute property of those descendants."

Salzgeber died in 1885 and the circuit court of the city of St. Louis on April 20, 1885, appointed F. Nohl his suc-

cessor and Nohl continued to act as trustee until October 30, 1891.

In October, 1891, Nohl was removed as trustee by the circuit court of the city of St. Louis, and appellant, August Rebenack, was duly appointed his successor by a judgment and decree of said court and afterwards duly qualified as trustee.

On December 23, 1891, he received from Nohl personal property of the value of $4,162.67, which he afterwards converted into $4,162.67 in cash.

On January 28, 1892, the appellant, who was then and is now an attorney at law, prepared the following document which was signed by Nellie Newton and himself:

"St. Louis, Mo., January 28, 1892.

"I hereby authorize my trustee, August Rebenack, to use the balance of the trust money in his hands to purchase any real estate he may deem advisable, and to take the title to such real estate in his name. Such real estate so bought with such trust money shall belong to him free from any equity in my favor in same. In consideration of the above authority given Mr. August Rebenack by me and in consideration of my relinquishment of my equitable rights in such real estate the said August Rebenack shall and hereby agrees to pay me six per cent per annum of the net amount of the trust money now in his hands.

"Witness our hands and seals this twenty-eighth day of January, 1892.

"NELLIE N. NEWTON, (Seal)
"AUGUST REBENACK. (Seal)"

The lower court found that on the day it was executed, the trust fund in the hands of appellant amounted to four thousand and sixty-eight dollars and ninety-seven cents. Ap-

pellant's own testimony tends to prove that in fact the funds in his hands about that time were only three thousand and sixteen dollars and ten cents, because he had been induced by respondent and her relatives, with whom she lived, to make advancements out of the principal to her to relieve her of urgent obligations and in fact provide for her necessities, by which the fund had been reduced to the amount last aforesaid. There was proof to the contrary. The account introduced by appellant shows he must have had five hundred and fifty-one dollars and sixty cents more in his hands on the twenty-eighth day of January, than he swore to having, as he paid respondent that sum between said date and the twenty-sixth day of March.

The evidence, too, showed that after the execution of the contract between appellant and respondent, the former invested the trust money in his hands in real estate, the title to which he took in his own name.

It was orally agreed between the beneficiary, Nellie Newton, and the appellant that she should receive said interest at the rate of six per cent per annum on that balance, paid in monthly installments of fifteen dollars per month, after the fund had been invested in real estate as aforesaid. This money was paid to her regularly until the first day of November, 1900, when the respondent's attorney notified appellant that he was about to institute this action against him. The first payment was made January 28, 1892. Respondent at that time must have been in the twenty-first year of her age, as the trust deed recites that she would be sixteen years old the third day of February, 1887.

The judgment of the trial court is as follows, omitting unimportant recitals:

That after January 28, 1892, said Rebenack did not invest said trust fund in bonds, stocks or notes secured by mortgage or deed of trust on unincumbered real estate, but that he

converted the same to his own use by investing the same in
real estate and taking the title thereto in his own name, and
that he has since disposed of said real estate and has not now
and has never had said trust fund invested in bonds, stocks or
notes secured by deed of trust, and that by reason of his con-
duct he has been guilty of a· violation of his duty as trustee,
and that by reason of his conduct he is not entitled to any
compensation as trustee, that said defendant, August Reben-
ack, should now have as trustee the sum of $4,068.97, and the
court doth thereupon order, adjudge and decree that the said
August Rebenack be removed as trustee, that Louis F. Zepp
be appointed his successor and that said Zepp give a bond as
such trustee in the sum of $6,000, and that said August Rebe-
nack pay to his said successor the sum of $4,068.97, that the
plaintiff recover her costs herein and have execution therefor."

The judgment was subsequently modified by allowing
appellant an additional credit of eighty-two dollars and
eighty-six cents, for taxes paid by him, thus reducing the
amount for which he should account to $3,986.15.

Defendant appealed.

GOODE, J.—Beyond all question the trust declared by
Neibelung was broken—nay more, it was demolished as far as
Rebenack could demolish it.    That is undeniable and is con-
ceded.

The provisions of the deed were ignored by him in every-
thing he did.    They, indeed, allowed the trust property to be
disposed of by the trustee whenever he might deem it advan-
tageous; but the proceeds were directed to be reinvested in in-
come-bearing securities, either bonds, stocks or notes, secured
by deeds of trust or mortgages.    Instead of this, the pro-
ceeds were invested in real estate; which was a clear breach,
even if done to conserve the trust instead of end it, as was the

purpose. Nothing could be rightly paid the first beneficiary, Nellie N. Newton, except the net income after the taxes and other expenses had been discharged.     Several years prior to Rebenack's appointment she had reached her sixteenth year, and the clause directing payment of the annual income to her in person had taken effect.   The purpose of Neibelung to conserve the capital was embossed on the face of the instrument, which provided that any surplus that might be left after defraying the expense of Nellie Newton's education and maintenance to her sixteenth year, should be added to the principal and that the principal, with its accretions should go at her death, to her descendants if she left any, and if not, should revert to the donor or his heirs.    All this was disregarded by the trustee.    In less than a month after he received the funds, he had reduced the principal about five hundred dollars, and in little more than a month he entered into an agreement with the life tenant, totally destructive of the objects of the trust, the desire, of the donor and the rights of the remaindermen.   In another two months, he still further diminished the principal by as much more.

An accounting was provided for in the deed, which Rebenack has failed to render for nine years.   He has converted the trust fund to his own use by taking title to the real estate purchased with it, to himself.    More flagrant breaches than the foregoing are scarcely imaginable.    Their effect was to wreck the trust which Neibelung created, with the expectation that it would be a provision for the objects of his bounty through many years.

The questions that arise for determination, relate to the effect of the statute of uses in executing the trust, and vesting the entire estate, both legal and equitable, in the respondent, her standing in this suit to have the principal of the fund restored, and, if she is entitled to be heard at all for that purpose, the measure of relief which ought to be granted.

Appellant's position that the statute of uses vested the full title to and ownership of the fund in Nellie Newton, thus enabling her to dispose of it at her pleasure, will not bear a moment's investigation. The trust created was an active and executory one; the trustee was charged with many duties to be performed for the benefit of both the life tenant and the remaindermen. In passive trusts, the rules of property often govern against the intention of the donor, if such intention is contrary to the law of property. In such instances, the statute of uses operates on the trust to vest the complete estate, accompanied by the *jus disponendi* in the *cestui que trust,* so that the property is entirely subject to his control, and is accessible by his creditors by due process of law. But the statute of uses never affects those trusts where active duties are imposed on the trustee in regard to the collection of the income of the estate or its control, conservation or transfer; and this is especially true when remainders over are created. To hold that the statute of uses lays hold of and executes such a trust, would be to hold the legal estate was transferred, the instant the trust was declared, to the beneficiary first named, and remained in him or her to the exclusion of the trustee; in which event it would be impossible for the latter to perform the duties imposed on him or in any way handle the estate; which would, therefore, be placed beyond his control or influence, and also beyond the care of the courts of chancery. The proposition, though earnestly urged, is palpably erroneous. The trust before us is in all respects similar to others which were held to have remained unexecuted by the statute of uses. Schoeneich v. Field, 73 Mo. App. 452; Pugh v. Hays, 113 Mo. 424; Jarboe v. Hey, 122 Mo. 341. A trust of this character can never be terminated except by its complete execution or the full consent, of all the parties in interest; and if some of the parties provided for are not yet in

Vol 90 app—42

being, it can neither be revoked nor terminated at all, but must be performed.  Smith v. Smith, 70 Mo. App. 448; Ewing v. Shannahan, 113 Mo. 188; Ewing v. Warner, 47 Minn. 446. Undoubtedly then, the acts of Rebenack, even if authorized or directed by Nellie Newton, were powerless to impair in any way the trust, however they might transmute or waste the estate or affect her rights as a concurring beneficiary.  All the provisions of Neibelung's deed are still in force for the benefit of every one therein named as a *cestui que trust,* except in so far as the status of the first principal may have been changed by her concurrence in the breaches; and it is the duty of an equity court to gather the fund and reinstate the trust on the terms declared by the donor.

This brings us to the question of the plaintiff's standing in such a court and to what extent she may be embarrassed by her participation in the breaches committed by the trustee, or by the lapse of time during which she has either acquiesced in the misuse of the estate or sought no redress.

As to the proposition that a trustee may sometimes exceed the income arising from the capital, and, if there is a great urgency, may encroach on it, we answer that it is inapplicable to this case because of the remainders over for the use of the other *cestuis que trustent* after the demise of the first one.  In such instances, the capital can not be impaired to relieve the first beneficiary, who must be rigidly restricted to the usufruct.  In re Potts, 1 Ashm. (Pa.) 340; Van Vechten v. Veghten, 8 Paige (N. Y.) 104.  The rule allowing the principal to be encroached on ought to be most guardedly applied in every case, and such a departure from the terms prescribed by the donor only sanctioned from the most extreme necessity.  Often the purpose of creating a trust is to place the property beyond the improvidence of a beneficiary, in the hands of one supposedly of more sagacity and firmness of character, who will see that it is neither dissipated by the

annuitant nor lent on inadequate security, but preserved intact, to yield an income through all vicissitudes to the one for whose future the donor felt anxiety. This was plainly the purpose here. Besides, as remaindermen were named, there can be no doubt the fund should have been kept according to the terms of the deed.

The statute of limitations was interposed as a defense to the suit. That statute runs against an action by a *cestui que trust* against a trustee for breaches when the trust is expressed as well as when it is constructive or implied; but does not begin to run in the case of a pure or technical trust, until the trustee repudiates his fiduciary character by some open act; whereas, if the trust is implied, it commences to run as soon as the right of action accrues to the *cestui que trust.* Keeton's Heirs v. Keeton's Adm'r, 20 Mo. 530; Smith v. Ricords, 52 Mo. 581; Philippi v. Philippi, 115 U. S. 151. This distinction rests on the ground that an express trust continues to live, in legal contemplation, until it is denied by the trustee, and during its continuance his title or right is that of the beneficiary; or, as is sometimes said, his tenure is according to his title.

In the present case, the appellant unequivocally treated the trust as extinct from the time the contract was made between him and the respondent for the purchase of real estate in his name with the fund; she was a party to that agreement; knew he bought a house and lot, taking the title to himself and holding it adversely to the beneficiaries of Neibelung's deed, and the statute began to run against her that moment.

The question of difficulty in this connection has been whether her right was barred in five years or whether the ten-year limitation governs? After much reflection and the examination of such precedents as we could find, we have concluded an action of this kind falls within the intention and purpose of that clause of the limitation statute applicable to

personal actions, which bars, after ten years, "actions for relief not herein otherwise provided for." R. S. 1899, sec. 4272.

The purpose of the suit is to reinstate the trust, restore the corpus of the estate, and remove the trustee. No other provision of the limitation law appears to embrace such litigation, except the one mentioned; which does embrace it for that very reason: It is an action to obtain relief not otherwise provided for in the limitation act. A similar clause is contained in the New York statute of limitations, and the courts of that State have treated it as designed to prescribe the period in which suits may be instituted for the redress of grievances of exclusively equitable cognizance and for which there is no concurrent remedy at law. They have construed it to be the statute applicable to actions like this one, where a *cestui que trust* invokes relief against a trustee for fiduciary misfeasance. McTeague v. Coulter, 6 J. & S. 208; Rodman v. Devlin, 23 Hun. 590; Hoyt v. Tuthill, 33 Hun. 196; Scott v. Stebbins, 91 N. Y. 605. The clause referred to came into our limitation law in the Code of 1855.

In Hunter v. Hunter et al., 50 Mo. 445, which was a suit to divest title to a tract of land out of the defendants on the ground that they had fraudulently induced plaintiff to part with it, so that a constructive trust arose in plaintiff's favor, the ten-year statute was held to govern. What is pertinent to the case in hand, is the remark that the clause barring in ten years, actions for relief not otherwise provided for, "seems to have been made to cover *equitable cases,* as well as others not falling under any other part of the statute." While the opinion speaks only of actions for the recovery of land or the enforcement of trusts growing out of sales of land, or their proceeds, it is reasonable to conclude the clause also governs actions for breaches of the terms of a trust declared in a written instrument, as no other clause seems applicable

thereto, and as this is the construction of the same limitation adopted by the appellate courts of New York. We would have no doubt of the propriety of so holding, but for the ruling in Keeton's Heirs v. Keeton's Adm'r, 20 Mo. 530, that the five-year statute barred that equitable action against an administrator for buying at his own sale, slaves belonging to the estate of the intestate, in analogy to actions at law 'for the recovery of personal property. That, however, was a case of a constructive instead of an express trust created by a written instrument. Nor was the provision of the limitation law we are now considering then in force; for that suit was governed by the limitation act contained in the Code of 1825. On the whole, we think plaintiff's remedy would only expire in ten years after appellant's adverse tenure commenced and that her suit was in time.

The next inquiry relates to the effect of the respondent's complicity in the breaches of the trust upon her right to have it restored. And herein we think the breaches committed in encroaching on the capital to make advancements to her for the relief of her wants, stand on a different footing from the one occupied by the contract between her and Rebenack which terminated the trust and authorized the latter to convert the fund into real property, to be held by him as his own absolutely. The testimony shows without dispute, that Rebenack encroached on the principal at the pressing solicitation of respondent and her relatives to assist her when she was in extreme distress for lack of money wherewith to pay her debts, or procure the necessities of life. About five hundred dollars were paid to her between the time when Rebenack received the fund and the date of the contract. He testifies he only had three thousand dollars on hand at that date; but his account shows he advanced about five hundred dollars more between that date and March; so he must have had thirty-five hundred dollars, or thereabouts, in his custody when the agree-

ment was made. This is immaterial, however, because all the advancements were shown to have been for the purpose of supplying her with articles she was bound to have, or paying debts she had contracted for board and other inevitable expenses. While Rebenack was remiss, and forgetful of the rights of the remaindermen, in thus impairing the capital of the trust, he appears to have acted fairly and from kindly impulses; and if the concurrence of a beneficiary in the illegal acts of a trustee will ever preclude such beneficiary from seeking relief against him, respondent's concurrence in the advancements to her, presents a case for the proper application of the rule. We will inquire as to the law on that subject presently.

We regard with less favor Rebenack's conduct in entering into the engagement with the respondent by which he was authorized to use the trust money to buy real estate for himself on the condition that he should pay her six per cent interest per annum on the net amount of the trust money in his hands. He is a lawyer and the respondent, at the time, was a young woman not quite twenty-one years of age. True she was *sui juris*. But considering the relation appellant bore to her, his knowledge and experience of business affairs compared with hers and, presumably, his knowledge of the law with regard to trust estates as compared with her ignorance of it, together with the fact that this agreement was made at his instigation a little more than a month after the money came into his hands, we must look on the transaction as reprehensible and as leaving her free to demand its rescission.

That we may dispose of the case according to equitable principles, it is necessary to notice some of the adjudications of similar controversies.

As respondent's counsel ignored the contention of the appellant that the status of the respondent was in any way altered by the latter's soliciting and receiving money from the

capital of the estate, we were forced to a laborious investiga-
tion of the cases, at the conclusion of which we are unable to
assent to the proposition that only the trustee's condition is
worse before the law, on account of the unwarranted manner
in which the estate was handled by him in compliance with
the wishes of the life tenant.   Concurrence of the beneficiary
in an act of a trustee which breaks the terms of the trust, as
either expressed in the instrument which created it or raised
by implication of law, bars the concurring party from pro-
ceeding against the trustee for such misfeasance.   This is an
old and well-established rule, supported by numerous cases.
Yet much is to be desired in the elucidation of it and the defi-
nition of its limits.   The decisions in which it is recognized
are singularly barren of any instructive discussion of the prin-
ciple on which it rests or the circumstances in which it may
be invoked.   It is often said acquiescence or concurrence by
the *cestui que trust* works an estoppel; but this can only be
true in the loose and general sense in which the word "estop-
pel" is sometimes used to signify any action which is held to
preclude a person from successfully asserting a right.   The
essence of an estoppel, strictly speaking, is deceit or misrep-
resentation.   St. Louis v. Lumber Co., 98 Mo. 613.   But of-
ten a *cestui que trust* has been barred from holding the trustee
responsible for a breach, on account of the *cestui que trust's*
acquiescence therein, when there was no misrepresentation, or
anything in the nature of deceit.   The true principle of such
a decision is waiver: the rule that where one party to a con-
tract, or a party entitled to a performance of a contract ac-
cording to certain terms and conditions, acts in such a manner
as to lead the opposite party to believe strict performance of
the terms will not be required, and thereby induces the other
party to act in a way that renders a strict performance im-
possible, he is not permitted afterwards to insist on the terms
which he had waived.   Bigelow on Estoppel (5 Ed.), p. 660.

The need of accurate limitation of the doctrine in question may be illustrated by referring to a spendthrift trust, or any other in which the purpose of the donor to preserve the estate from the carelessness or folly of the *cestui que trust,* appears on the face of his declaration. It certainly would be a poor excuse for a trustee to offer for having wasted the capital by advancements to such a beneficiary, that he did so with his concurrence. To heed such an excuse, would annul the very purpose the donor intended to accomplish; and probably in such a case the defense would not be tolerated. Indeed, the thought obtrudes that a trustee of an express trust ought rarely, if ever, to be excused for breaches because the *cestui que trust* concurred in them. The law gives an individual the right to settle a trust in favor of whomsoever he will and restrict the beneficiary to an annuity. If it also permits the trustee and the *cestui que trust* to disregard the purpose of the donor with impunity, we have the contradiction of permitting a settlement in trust according to the wish of the donor, round which settlement the law claims to throw its safeguards, which, however, may be broken through whenever the *cestui que trust* and the trustee desire. But it is certain that courts of equity for centuries past have barred the beneficiary from relief against illegal acts of the trustee to which he consented. The English reports are much fuller in cases of this kind than ours, because testamentary and marriage settlements are more common in that realm. The party to be barred must, of course, have been *sui juris* at the time of his concurrence. Thayer v. Gould, 1 Atk. 615; Sawyer v. Sawyer, L. R. 28 Ch. Div. 595. Singularly enough, however, in one of the first cases on the subject, no less a chancellor than Lord HARDWICKE ruled a married woman might be denied relief, saying: "If she draw in a trustee to do anything against her benefit, she being so concerned shall not afterwards be admitted to take advantage of it against the trustee." This

must have been on the theory that she was *sui juris* as to her separate estate, and only true when the litigation was about that kind of property; on which point Sir EDWARD SUGDEN once said: "I hope the court may feel at liberty to treat a woman, entitled to her separate use in possession, as *sui juris,* so as to bind her interest where she prevails over her trustee to commit a breach of trust."

The general rule undoubtedly is that any disability, whether coverture, infancy or some other, prevents acquiescence from barring relief against a trustee, as it prevents the deprivation of any right by the consent of one not *sui juris.* But if a person of full legal status influences a trustee to do a wrong act about property settled to such a person's enjoyment, he may not afterwards complain of the injury he sustained by the act. This rule has received the sanction of the most eminent chancellors.

A leading case is Brice v. Stokes, 11 Ves. Jr. 319. There certain property had been settled at marriage on the wife, for her separate use for life, with remainders to her husband surviving her for his life, and then to their issue. The wife died without issue. A sale had been made by the trustees of the settlement which was illegal, but was concurred in by the husband. After the wife's death he brought a bill against the trustees to charge them on account of the unlawful sale. Lord ELDON said: "It is clear upon settled cases, that if there are two trustees and a transaction takes place in which the fund is taken out of the state in which it ought to have remained, and is not placed in the state in which it ought to be, but is kept in hands which ought not to retain it, if any particular *cestui que trust* has acted in authorizing that as much as the trustee, who has not the money in his hands, and continues to permit it to be so treated, in a question between the *cestui que trust* and that trustee, the latter can not be called on by the former." It was held that as

the husband had acquiesced in the breach he should be denied redress.

In Langford v. Gascoyne, 11 Ves. Jr. 333, the defense of acquiescence by the widow in certain breaches was rejected, but simply because the evidence of her acquiescence was too slight.

Wilkinson v. Parry, 4 Russ. 272, was where certain stocks were given in trust in a marriage settlement, the dividends to be paid to the intended wife to her separate use with remainders to the children when they came of age. The stock was sold out by the trustee in order to be invested in an annuity for the life of the widow, that her income might be increased. Afterwards, the widow and three of the children filed a bill to make the trustees responsible for the consequences of the sale, which was unwarranted. The trustees were held responsible to the minor children for whatever loss was caused by the sale; but the master of the rolls treated the three children who were of age and the widow, as barred, because they had acquiesced in the disposition of the stock and signed the bill to indemnify one of the trustees if he would sell it.

Fellows v. Mitchell, 1 P. Wms. 81, was a case in which the question was whether one trustee could be made chargeable for the loss of the moiety of a fund of two thousand pounds sterling by his co-trustee. It seems that each of the trustees received one-half of the fund with the consent of the *cestui que trust*. The chancellor said: "The case was attended with circumstances somewhat uncommon; for the *cestui que trust* has admitted that he was present and consenting to the payment of the money in moieties and that at his importunity the trustees joined in an acquittance of the whole." The decree was that each defendant should answer only for that portion of the fund which he actually received. That was an early case.

In Broadhurst v. Balguy, 1 Y. & Col. 15, a bill was filed to charge a trustee with the loss of a fund occasioned by his co-trustee. It was held that both were liable; because one was guilty in losing the fund and the other by allowing the proceeds of the stock which constituted it, to be retained solely by his colleague. The point of difficulty in the case was said to be whether the knowledge and acquiescence of the *cestui que trust,* in the retention of the fund by the trustee, was a defense in favor of the other? It was held that if he had such knowledge and acquiesced in it, he would be barred. The case was sent back to the master to take further testimony on the question of his knowledge and acquiescence.

In Raby v. Ridehalgh, 7 De. G. M. & G. 104, the trust was a testamentary one in favor of tenants for life with remainders over, and the suit was against the trustees for breaches. The defense was that the tenants for life had induced the trustees to make the investments complained of as unlawful, in order to increase the income. On these facts the concurring *cestuis que trustent* were barred.

Mail v. Punter, 5 Sim. 555, was where, by a marriage settlement, stocks were settled on the wife for her separate use for life, she to take the dividends while living and after her death the capital and dividends to be transferred to such person as she should appoint by will. After the marriage the trustee, at the request of the husband and wife, sold out the whole of the stocks and paid the proceeds to the husband. He gave an equitable mortgage therefor, which proved an insufficient security and became bankrupt. Subsequently his wife died, having appointed him by will to take the trust estate. The wife, prior to her death, had filed a bill against the trustees, charging them with having committed a breach in selling the stocks, and praying they might be decreed to transfer stocks to the same amount into court, that the dividends might be paid to her during her life and the securities

assigned to a new trustee to be appointed. After her demise, the husband filed a bill of revivor of said suit as appointee under the will and also as executor of it. The trustee answered that he (the plaintiff) had retained the money himself resulting from the sale of the stock. It was held that as the plaintiff had obtained and retained the fund through a breach of the trust, and received the entire benefit thereof, "it would be contrary to plain justice that he who has had the money once should have it a second time."

In Griffith v. Porter, 25 Beav. 236, the fund had been lost by improvidently entrusting it to certain solicitors in contravention of the terms of the will. One of the trustees did that act with the concurrence of the *cestuis que trustent,* it was claimed, the other trustee having no part in it but not contesting it as illegal. It was held he would have been exonerated if the fund had been placed with the solicitors with the consent of the beneficiaries, but that this was not shown. This passage is used in the opinion: "It has been justly observed that the court will not visit a trustee with the consequence of a breach of trust committed with the sanction or by the desire of the *cestui que trust;* or one committed without the sanction or desire of the *cestui que trust,* if, when it comes to his knowledge, he has acquiesced and obtained the benefit of it for a long period."

Sawyer v. Sawyer, L. R. 28 Ch. Div. 595, was where the bar failed solely because the plaintiff was under the disability of coverture when she participated in the breach.

In Smith v. French, 2 Atk. 243, a violation of the terms of the settlement occurred while the beneficiary was covert, and was induced by the importunity of her and her husband to relieve their necessities. Afterwards, she sought to enforce a demand against the trustee, who was her own mother, on account of the latter's departure from the conditions of the trust. The defendant was exonerated, however, on the

score that the wife had solicited the breach while married, and ratified it after she became a widow.

In Fyler v. Fyler, 3 Beav. 550, there were a tenant for life and remaindermen. In order to make a better income out of the fund, the investment was unwarrantably changed by the trustee and a loss resulted. The bill was filed by the remaindermen. The master of the rolls said: "If all this (namely, the reinvesting of the funds) has taken place with the consent of the parties now complaining, it certainly appears to me that they would not have any right to maintain this suit, for *volenti non fit injuria*. If they have authorized this course of dealing with their own fund, it would be in the highest degree unjust to permit them to establish a claim against those who have acted under their authority."

In Life Ass'n of Scotland v. Siddall, 3 De. G. F. & J. 58, 271, the chancellor, in discussing this doctrine in its various phases said: "I need hardly add that in cases in which the *cestui que trust* has encouraged the trustee to commit the breach of trust, he must, of course, be bound by it."

Pope v. Farnsworth, 146 Mass. 339, was where an executor had bought stock in a life insurance company for the benefit of the life tenant with the consent of the remainderman, and had also encroached on the principal for the life tenant's benefit without the consent of the remainderman. It was held he must make good the amount of the encroachment at the suit of the remainderman, but could not be held by the latter for loss of interest caused by investing in the stock of the insurance company, to which he had assented. The court said: "The plaintiff must stand to his agreement. There is no illegality in a *cestui que trust* authorizing an act which otherwise would be a breach of trust towards himself; or in releasing or agreeing to hold harmless his trustee for such act after it is done."

In Adair v. Brimmer, 74 N. Y. 539, the court recog-

nized the rule, but refused to enforce it under the circumstances of that case; as was also true in Luers v. Brunjes, 5 (Redf.) N. Y. 32. Mulford v. Minch, 3 Stockton's Ch. (N. J.) 16, both recognized and applied the rule. So, also did Hume v. Beal, 17 Wall. 336, and Follansbe v. Kilbreth, 17 Ills. 522.

The foregoing authorities conclusively establish the proposition that a concurring and acquiescing *cestui que trust,* is denied redress against a defaulting trustee, on account of any injury sustained by the latter's misconduct at the former's request or with his approval. The doctrine, under the various designations of concurrence, acquiescence, confirmation, ratification and estoppel, is a part of equity jurisprudence and must be upheld.

We rule, therefore, that the respondent's solicitation of advances from the capital of the trust fund, she being at the time *sui juris,* and the advancements being for the purpose of relieving her necessities, and without any dishonest or selfish motive on the part of the appellant, precludes her from asserting a right to have the amount thus subtracted from the capital restored to it by the trustee for her benefit.

But as the court has jurisdiction of this case at the instance of a party in interest who is entitled to complain of the investment of the trust fund in real estate held in the name of the trustee, complete justice ought to be done in the premises. The capital ought to be made whole and all who contributed to its impairment should be made to contribute to its restoration. Rebenack can not be let off because, as he claims, he was wheedled by the respondent into encroaching on the principal. He knew such conduct was illegal and in violation of the wishes of the donor and the rights of the remaindermen. He must make good the capital. The respondent, as a participant in the breaches and, indeed, the instigator of them, and as the person who alone profited

thereby, ought to stand the loss by reimbursing the trustee. All persons participating in the violation of a trust, whether they are trustees, *cestuis que trustent* or strangers, are liable for the consequences of the breach. White & Tudor's Leading Cases in Equity, part II, vol. 2, p. 975.

In Booth v. Booth, 1 Beav. 125, where the widow of the deceased, who was one of the beneficiaries of the trust which had been established, concurred in a breach of the terms of the testator's will, she was forced to contribute to make up the loss thereby occasioned. The chancellor said: "That the widow concurred, seems to be quite clear; and any interest to which she may be entitled is the proper fund to resort to in the first instance. If she has obtained any benefit from the breach of trust, the trustee ought to be compensated in respect of it."

So, in Raby v. Ridehalgh, 7 De. G. & M. 104, where the life tenants had induced the trustees to make an unauthorized investment in order that their income might be increased, they were not only denied relief against the trustees for the resultant loss, but the court ordered them to reimburse the trustees, who were responsible to the remaindermen. It was also ruled that only their interest in the trust estate could be looked to for such reimbursement; but that ruling seems to have been because, in the circumstances before the court, if they were made to contribute from their property outside of the trust fund, each of the life tenants might have to pay the whole loss, on account of the others being insolvent, although the paying one only received part of the profit arising from the breach of the trust.

So, in Mulford v. Minch, 3 Stockton's Ch., supra, where a trustee bought at his own sale with the concurrence of a beneficiary, the court set the sale aside, but relieved him to the extent of granting a lien on the property in his favor for any advances of a reasonable sort he might have made.

On the authority of the above precedents, and others which might be cited, we hold the respondent must reimburse the appellant out of her interest in the trust estate for such sums as he paid her out of the corpus of the fund at her solicitation, and which he is compelled to return to the fund.

We have already stated the reasons why we think respondent's case is good to have the money invested in real estate by appellant, restored, to be held according to the terms of Neibelung's deed. She received no benefit whatever from that transaction. It is elementary law that a trustee is not permitted to purchase at his own sale. This he can not do, whether his motive is good or bad, and however innocent his conduct may be, without the full knowledge and consent of the *cestui que trust,* and sometimes not even with such knowledge and consent. Regardless of fairness, such a purchase is voidable at the instance of the *cestui que trust.* Cumberland Coal Co. v. Sherman, 30 Barb. Ch. 553; Hoffman Steam Coal Co. v. Cumberland Coal & Iron Co., 16 Md. 456. No one is permitted to buy and hold property for his own, as to which he has a duty to perform inconsistent with his interest as a purchaser on his own account. Tuggles v. Callison, 143 Mo. 527. It is also the law that if a trustee acts with the consent of the *cestui que trust* in becoming interested in the purchase of property with the management of which he is charged, the sale will be set aside in equity, in the absence of clear and unequivocal evidence, produced by the trustee, that the transaction was free from fraud or undue influence. Newman v. Newman, 152 Mo. 398.

We have intimated that we do not consider appellant estopped to complain of the land purchase by Rebenack. The courts have often had occasion to consider what acts of acquiescence, concurrence or confirmation will suffice to exonerate a trustee in thus dealing with the estate and sustain a purchase by him either of the trust property or with it.

Possibly no better cases can be found than Hoffman Steam Coal Co. v. Cumberland Coal & Iron Co., 16 Md. 456; Cumberland Coal & Iron Co. v. Sherman, 20 Md. 117, and Cumberland Coal Co. v. Sherman, 30 Barb. Ch., supra. That litigation engaged the attention of the Supreme Court of Maryland twice and the Supreme Court of New York once. The question was as to the sufficiency of the ratification by the stockholders of a corporation, of a purchase of corporate assets by a trustee in his own name. Both of these tribunals concurred in holding that the ratification, to be binding on the stockholders, must have been made with full knowledge of all the facts of the transaction, that it must appear a fair price was paid by the trustee, that he took no advantage of the *cestuis que trustent*, that the latter had full knowledge of their legal rights at the time of the alleged confirmation and knew the transaction was of such a character they could impeach it in a court of equity. These cases were decided after much consideration and an extensive review of the authorities. The confirmation pleaded as a defense was rejected, although the stockholders were experienced business men and fully competent to protect their interests. That determination of the question is in harmony with the unbroken current of opinion.

In Buckeridge v. Glasse, Craig & Phillips 126, where a husband had raised money on his marriage settlement by suppressing the settlement, and had lent the money to the trustee who became insolvent, and the widow filed a bill in her own name and her children's to follow the money into the hands of the trustee's representative, it was held she was not barred by the fact that she had signed the mortgage, thus concurring in the breach. She was covert at the time, it is true, but the court said: "To preclude a party on that ground, it must be shown she was cognizant of the breach of trust."

Vol 90 app—43

In Luers v. Brunjes, 5 Redf. (N. Y.) 32, the concurring beneficiaries being a widow above sixty years of age and two daughters, unacquainted with business, it was ruled "that the confirming party must be aware of the law—that he might impeach the transaction in a court of equity." Cumberland Coal Co. v. Sherman, 30 Barb., supra, was cited and followed.

Adair v. Brimmer, 74 N. Y., supra, was a case where the executor had wrongfully disposed of the land of the estate for corporate stock and, when sued by the beneficiary, pleaded a ratification. The interests involved were large and the discussion of the question extensive. It was said that to establish a ratification by a *cestui que trust,* the fact of ratification must not only be clearly proved, but it must be shown it was made with full knowledge of all the particulars and circumstances and, also, in a case like that one, that the *cestui que trust* was fully apprised of the acts ratified and of his or her legal rights in the matter. "Confirmation and ratification imply to legal minds, knowledge of a defect in the act to be confirmed and of the right to reject or ratify it. The *cestui que trust* must, therefore, not only have been acquainted with the facts, but apprised of the law, how these facts would be dealt with by a court of equity. All that is implied in the act of ratification, when set up by a trustee against his *cestui que trust,* must be proved and will not be assumed. The maxim *ignorantia legis excusat neminem,* can not be invoked in such a case. The *cestui que trust* must be shown, to have been apprised of his legal rights." Of course, concurrence and ratification are alike in respect to the elements necessary to give them force.

In Mulford v. Minch, 3 Stockton's Ch. (N. J.), supra, where an administrator had bought land of the testator under an order of sale of the orphan's court, and sought to excuse himself by the acquiescence of the *cestui que trust,* it was

said: "That there may be such acts of acquiescence on the part of a *cestui que trust,* standing in the relation which these defendants bear to the complainant in this transaction, as will debar him from the right of having the sale set aside, there can be no doubt. . . . I deem it unnecessary, for the determination of this case, to review the numerous authorities upon the question as to the character of the acts which the court will construe as acts of acquiescence and confirmation of such titles as the one we are considering. A large number of them may be found collected in the case of Butler v. Haskell, 4 Desau. 708. One principle is well settled by all the authorities, and that is, no act will be held as an act of confirmation by a court of equity unless it was done with a knowledge of his legal and equitable rights by the party whose rights it is sought to conclude by it."

This subject is most exhaustively treated and all the authorities discussed in Butler v. Haskell, 4 Desau. (S. C.) 651, and the proposition established that to make the concurring or ratifying act effective, there must have been no duress, disability or urgent pressure of necessity on the *cestui que trust,* and that he must have had full knowledge of his legal rights and have been *sui juris.*

So, Lord HARDWICKE, in Ryder v. Bickerston, 1 Eden, * 149, ruled that acquiescence or concurrence would only bar an action against the trustee where the *cestui que trust* was fully informed as to the state of the case.

By the foregoing authorities from this and other jurisdictions, it is apparent that the conversion of the trust money into real estate, to be held by the appellant without reference to the terms of the trust, can not be supported against the respondent's assertion of her claim on the ground that she concurred in the act. It is not shown, and does not appear that such a disposition of the fund was to her benefit; nor that she knew it was a breach of the trust; nor that she

was aware it could be resisted or vacated by a proceeding in equity; nor that she was not overreached in the matter. All these things it was incumbent on the appellant to establish. Moreover, the act was to the prejudice of the remaindermen. We think the respondent's case is strong to have that breach made whole by the appellant. The punctilious fairness—*uberrima fides*—required to excuse such a dealing with a trust estate, was not shown to our satisfaction.

The judgment of the court below removing the appellant and appointing his successor as trustee, and adjudging that appellant restore the trust fund, meets our full approval.

We have calculated the advancements made by the appellant to the respondent out of the principal of the fund, as shown by appellant's account, the sum of the installments now due to respondent, have subtracted the latter from the sum of said advancements, have also subtracted the commission with which appellant credited himself, and find the amount which he ought to be reimbursed by respondent is seven hundred and twenty-seven dollars.

It is therefore considered, adjudged and decreed that Louis F. Zepp be appointed to succeed the appellant as trustee of the trust created by the aforesaid deed of Charles H. Neibelung, that said Zepp give bond as such trustee in the penal sum of six thousand dollars, to be approved by the judge of the circuit court of the city of St. Louis before whom this cause was tried, or his successor in office, that appellant be not allowed any compensation for his services as trustee, that appellant pay to his said successor, Louis F. Zepp, the sum of three thousand nine hundred and eighty-six dollars and fifteen cents with interest thereon at the rate of six per cent per annum from the nineteenth day of January in the year of our Lord nineteen hundred and one, until the same is paid in restoration of the trust fund, less sixty-four dollars which he may retain to be credited on the amount to be paid him as

St. Louis Quarry and Con. Co. v. Frost.

hereinafter directed, as the aggregate of said principal sum and interest thereon to date would exceed the original capital of the trust fund by sixty-four dollars.

It is further considered and adjudged that if the appellant shall make said payment to his said successor without further action or process on or before the first day of next March, in that event his said successor shall pay to the appellant the net income of said trust fund until appellant shall have been reimbursed in the sum of seven hundred and twenty-seven dollars; provided the life of said Nellie N. Newton, the life tenant, shall continue until said sum shall have been paid.

It is further considered and adjudged that the new trustee Louis F. Zepp, and any and all successors of his as trustee, shall render an account annually of their receipts, disbursements and expenditures and of all their doings in the matter of said trust to the circuit court of the city of St. Louis, so long as the said trust shall continue.

It is further considered and adjudged that the appellant pay all the costs of this action in the circuit court and in this court. *Bland, P. J.,* and *Barclay, J.,* concur.